1

**COOLEY LLP**
2    MATTHEW D. CAPLAN (260388)
(mcaplan@cooley.com)
3    3 Embarcadero Center, Floor 20
San Francisco, California 94111-4004
4    Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222
5

6    ALEXANDER K. BREHNAN (317776)
(abrehnan@cooley.com)
7    Cooley LLP
3175 Hanover Street
8    Palo Alto, California 94304-1130
Telephone:    (650) 843-5000
9    Facsimile:    (650) 849-7400

10    Attorneys for Plaintiff
ANTARES SYSTEMS INC.
11

12                UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14

15    ANTARES SYSTEMS INC.,                 | **DEMAND FOR JURY TRIAL**

16                Plaintiff,                | Case No.

17        v.                               | **PLAINTIFF ANTARES SYSTEMS INC.'S**
                                            **COMPLAINT FOR BREACH OF**
18    SOPHIA XU,                            **CONTRACT AND MISAPPROPRIATION**
                                            **OF TRADE SECRETS IN VIOLATION**
19                Defendant.               **OF DEFEND TRADE SECRETS ACT**

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW

Plaintiff Antares Systems Inc. (d/b/a Morph Labs) ("Plaintiff," "Morph," or the "Company") submits this Complaint (the "Complaint") against Defendant Sophia (a/k/a Haoji) Xu ("Defendant" or "Xu"), and alleges as follows:

## INTRODUCTION

1.      This action concerns a former employee of Morph who used her personal devices to access and download the Company's sensitive, confidential and trade secret information, and her subsequent refusal to delete that information. The former employee has acknowledged that she stored the information on her personal devices during her employment but has failed to confirm she permanently deleted that information after her termination from the Company despite a contractual obligation to do so. Instead, she has repeatedly provided misleading and incomplete statements concerning its deletion. She also has refused to confirm whether she has used or disclosed any of the Company's information that she had knowledge of or downloaded onto her personal devices.

2.      The Company made several attempts to resolve this issue prior to initiating this action, including email and letter correspondence reminding the former employee of her contractual obligations. These efforts only led to greater concern by the Company as to the former employee's continued possession of the Company's confidential information, due to her refusal to comply with the Company's requests for and misleading representations concerning deletion of or use and disclosure of that information. Worse, the Company now has reason to believe that the former employee has disclosed or intends to disclose that confidential information to her soon-to-be employer, which is a direct competitor of the Company. Thus, the former employee, through her misconduct, has forced the Company to initiate this litigation to protect its rights.

3.      Founded in 2023 in San Francisco, California, Morph is a start-up company on the cutting edge of the artificial intelligence boom. The Company is focused on building software that will provide the digital infrastructure crucial for the functioning of tomorrow's AI software engineers. The Company also offers its customers autonomous AI agents that develop applications on top of the Company's infrastructure software at the customers' request. The information and data related to the Company's software is highly confidential, commercially sensitive and, as a

COOLEY LLP
ATTORNEYS AT LAW

result, heavily protected by Morph.

**4.**     Morph has expended substantial time and resources to develop its software, the underlying code, and other proprietary information. The Company restricts access to and dissemination of this confidential and proprietary information, including its software source code, its drawings and diagrams, and its know-how concerning the foregoing, to those who need to have such information and who agree to and/or are bound to maintain its confidentiality and not use it for any purpose other than what is authorized by the Company.

**5.**     From October 28, 2024 to December 25, 2024, Morph's former employee at issue, Sophia Xu, worked for the Company as a technical engineer. In this role, Xu was charged with supporting the technical engineering team in writing and contributing code to pieces of Company software. To perform her day-to-day duties, Xu required and had substantial access to sensitive technical details, including about the Company's machine learning data for its AI model, product software, internal software systems, cloud architecture, systems design, user interface and user experience research, and strategic roadmap. Included in that software is the underlying code for the Company's core digital infrastructure software, which is critical for the functioning of its Morph Cloud product – the Company's main line of business. Xu also frequently discussed the Company's competitive strategy with her team.

**6.**     Given the sensitivity of the information she had access to in her role, Xu entered into an employment agreement (the "<u>Employment Agreement</u>"), an Employee Confidential Information and Inventions Assignment Agreement (the "<u>Confidentiality Agreement</u>"), and a Mutual Non-Disclosure Agreement (the "<u>Non-Disclosure Agreement</u>"), all of which set forth Xu's obligation to maintain the confidentiality of Company-provided information, such as only using Company-provided devices to access Company-provided information. Without signing these agreements, Xu would not have been given access to the Company's confidential information and would not have been employed by the Company. These obligations, per the agreements, persist after termination and require Xu to keep all such Company information in strict confidence, to return all such information (and any copies) to the Company when her employment ended, to

COOLEY LLP
ATTORNEYS AT LAW

permanently delete such information from personal devices, and to provide the Company reasonable access to her personal devices to verify the necessary copying and/or deletion of any Company information.

7.      The Company stores its confidential information on a cloud-based file storage system and provides its employees with a Company-provided laptop from which to access that information. The Company only permits its employees to access, and in fact instructs them to only access, that information or its storage system by using such Company-provided devices. The Company's cloud-based file storage system is the primary location where Company information is stored, accessed, and edited by Company employees. The Company also only permits its employees to access its storage system from a Company network.

8.      The Company learned, through access and download records, that during Xu's employment at the Company – despite being given a Company-provided laptop and instructed to use it to access Company systems and information – Xu primarily used her personal devices (including a MacBook, a Dell XPS laptop, a cell phone, and an Ubuntu server) to access the Company's cloud-based storage system and review, edit, and download Company information stored on that system. Xu also primarily accessed the Company system from outside of the Company network. For instance, and of grave concern to the Company, Xu accessed the Company system from her personal devices to clone several repositories of source code that contained commercially valuable and confidential information, including extremely sensitive trade secret information related to the Company's software, to those devices.

9.      Based on a forensic review and communications with Xu, the Company determined that Xu continued to possess the Company's confidential information on her personal devices after her employment ended in violation of her agreements with the Company.

10.      But, instead of simply deleting the information and verifying she had done so, Xu made misleading and incomplete statements to the Company regarding her continued possession and purported deletion of the Company's confidential information that was transferred to her personal devices. Additionally, Xu refused to confirm whether she used or disclosed any of that

information or any other confidential information she learned only as a result of her employment at Morph. Instead, Xu again made misleading and incomplete statements regarding her use or disclosure of the Company's confidential information.

11.    The Company's concerns escalated when Xu suddenly left San Francisco for her native country of China. The Company learned she had misrepresented her visa status and had been unlawfully in the United States for weeks. Xu did not communicate with the Company or its employees for several days after her departure.

12.    Finally, the Company has reason to believe that Xu has disclosed or intends to disclose the Company's confidential information to its competitors. On information and belief, Xu did so while interviewing for a new job at a direct competitor in Morph's market. The Company also has reason to believe that Xu intends to disclose the Company's confidential information to a soon-to-be employer from which she accepted a job offer.

13.    Thus, Morph seeks preliminary injunctive relief against Xu to enforce the terms of her agreements with the Company and protect the Company's confidential information and trade secrets, including her obligation to allow the Company to inspect her personal devices to confirm deletion of that information.

14.    Morph also reserves the right to seek monetary damages to compensate it for any losses caused by Xu's actions and injunctive relief in an arbitration proceeding in accordance with the agreement between the Parties set forth in the Employment Agreement.

## THE PARTIES

15.    Plaintiff Antares Systems Inc. (d/b/a Morph Labs) is a corporation organized and existing under the laws of Delaware with its principal place of business located at 580 Howard Street, Unit 403, San Francisco, CA 94105.

16.    Defendant Sophia Xu is an individual domiciled in San Francisco, California. The Company has reason to believe she is currently employed or has accepted a job offer by another San Francisco-based company.

17.    Antares Systems Inc. and Xu are parties to the Employment Agreement, which was

executed by the parties on or about October 11, 2024. (*See* Exhibit A.)

18.    Antares Systems Inc. and Xu are parties to the Confidentiality Agreement, which was executed by the parties on or about October 11, 2024. (*See* Exhibit B.)

19.    Antares Systems Inc. and Xu are parties to a Non-Disclosure Agreement, which was executed by the parties on or about October 11, 2024. (*See* Exhibit C.)

## JURISDICTION AND GOVERNING LAW

20.    Personal jurisdiction and venue in this Court are proper by virtue of the parties' express written agreement in the Confidentiality Agreement.

21.    The Confidentiality Agreement provides in relevant part: "[Xu] expressly consent[s] to the personal jurisdiction and venue of the state and federal courts located in California for any lawsuit filed there against me by Company arising from or related to this Agreement." (Exhibit B, Confidentiality Agreement § 12.1.)

22.    The Non-Disclosure Agreement provides in relevant part: "Any disputes under this Agreement may be brought in the state courts and the Federal courts for the county in which Company's principal place of business is located, and the parties hereby consent to the personal jurisdiction and exclusive venue of these courts." (Exhibit C, Non-Disclosure Agreement § 11.) The Company's principal place of business is in San Francisco, California.

23.    Furthermore, personal jurisdiction is proper in this Court because Xu is domiciled in San Francisco, California and frequently worked at the Company's San Francisco headquarters.

24.    Because all claims brought by the instant Complaint arise out of and relate to Xu's employment agreements with the Company, this Court has personal jurisdiction due to the parties' express agreement. (*See* Exhibit B, Confidentiality Agreement § 12.1; Exhibit C, Non-Disclosure Agreement § 11.)

25.    This Court has federal jurisdiction pursuant to 28 U.S.C. § 1331 because Morph alleges a cause of action under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836, *et seq*. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over any state law claims, such as for breach of contract, as they arise from a common nucleus of operative fact with the federal cause

COOLEY LLP
ATTORNEYS AT LAW

of action.

## FACTUAL ALLEGATIONS

### Xu's Role and Agreements with the Company

**26.**    Xu was hired by Morph as a Technical Staff Member and began work on October 28, 2024. (Exhibit A, Employment Agreement.)

**27.**    Part of Xu's duties as a Technical Staff Member included supporting the Company's technical engineering team in tasks central to the development of the Company's products, such as writing and contributing to source code to enhance the Company's software. To perform such duties, Xu was necessarily given access to the Company's machine learning data for its AI model, product software (including for Morph's digital infrastructure and AI agents), internal software systems, code bases, and other sensitive technical information, such as cloud architecture, systems design, user interface and user experience research, strategic roadmap, and competitive strategy information.

**28.**    As a condition of her employment (and access to the aforementioned information), Xu was required to, and did sign, the Company's standard employment agreement, confidentiality agreement, and non-disclosure agreement. (*See* Exhibit A, Employment Agreement; Exhibit B, Confidentiality Agreement; Exhibit C, Non-Disclosure Agreement.)

**29.**    Morph considers the agreements entered into by its employees to be critical to the Company's efforts to protect the confidentiality of the Company's trade secret and confidential information. By signing the Confidentiality Agreement and the Non-Disclosure Agreement, Xu acknowledged her duties of confidentiality and agreed to protect Morph's trade secrets and other confidential information.

**30.**    Under Section 1.1 of the Confidentiality Agreement, Xu recognized the Company's rights with regard to its confidential information: "Company has a protectable interest in the Confidential Information . . . . Company information or documentation to which [Xu has] access during [her] employment, regardless of whether it contains Confidential Information, is the property of Company and cannot be downloaded or retained for [her] personal use or for any use

that is outside the scope of [her] duties for Company." (Exhibit B, Confidentiality Agreement § 1.1.)

31. "Confidential Information" is defined in the Confidentiality Agreement as: "any and all confidential knowledge or data of Company, and includes any confidential knowledge or data that Company has received, or receives in the future, from third parties that Company has agreed to treat as confidential and to use for only certain limited purposes. By way of illustration but not limitation, Confidential Information includes (a) trade secrets, inventions, ideas, processes, formulas, software in source or object code, works of authorship, data, technology, know-how, designs and techniques, and any other work product of any nature, and all Intellectual Property Rights (defined below) in all of the foregoing (collectively, "Inventions"), including all Company Inventions (defined in Section 2.1); (b) information regarding research, development, new products, business and operational plans, budgets, unpublished financial statements and projections, costs, margins, discounts, credit terms, pricing, quoting procedures, future plans and strategies, capital-raising plans, internal services, suppliers and supplier information; (c) information about customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, and other non-public information; (d) information about Company's business partners and their services, including names, representatives, proposals, bids, contracts, and the products and services they provide; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information that a competitor of Company could use to Company's competitive disadvantage." (Exhibit B, Confidentiality Agreement § 1.2.)

32. Xu also recognized similar rights of the Company under Section 2 of the Non-Disclosure Agreement: "the Receiving Party agrees that at all times and notwithstanding any termination or expiration of this Agreement it will hold in strict confidence and not disclose to any third party any Confidential Information of the Disclosing Party, except as approved in writing by the Disclosing Party, and will use the Confidential Information of the Disclosing Party for no purpose other than the Permitted Use. The Receiving Party will also protect such Confidential

Information with at least the same degree of care that the Receiving Party uses to protect its own Confidential Information, but in no case, less than reasonable care. The Receiving Party will limit access to the Confidential Information of the Disclosing Party to only those of the Receiving Party's employees or authorized representatives having a need to know and who have signed confidentiality agreements containing, or are otherwise bound by, confidentiality obligations at least as restrictive as those contained herein." (Exhibit C, Non-Disclosure Agreement § 2.)

33.     "Confidential Information" is defined in the Non-Disclosure Agreement as: "any and all technical and non-technical information disclosed by [the Company] to [Xu], which may include without limitation: (a) patent and patent applications; (b) trade secrets; (c) proprietary and confidential information, ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, algorithms, software programs, software source documents, and formulae related to the current, future, and proposed products and services of each of the Parties, such as information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, and marketing plans; and (d) all other information that [Xu] knew, or reasonably should have known, was the Confidential Information of the [Company]." (Exhibit C, Non-Disclosure Agreement § 1.)

34.     Upon termination of Xu's employment with the Company, Xu agreed to: "deliver to Company any and all materials, together with all copies thereof, containing or disclosing any Company Inventions, or Confidential Information. [Xu] will not copy, delete, or alter any information contained upon my Company computer or Company equipment before [Xu] returns it to Company." (Exhibit B, Confidentiality Agreement § 8.)

35.     Xu also agreed that "[u]pon termination or expiration of this Agreement, or upon written request of [the Company], [she] will promptly return to the [Company] or destroy all documents and other tangible materials representing the [Company]'s Confidential Information and all copies and summaries thereof and notices related thereto." (Exhibit C, Non-Disclosure

Agreement § 6.)

**36.** At that time, Xu also agreed to allow the Company to inspect her personal devices upon termination. Specifically, she agreed that "if [she has] used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, [Xu] agree[s] to provide Company with a computer-useable copy of all such information and then permanently delete such information from those systems; and [Xu] agrees to provide Company access to [her] system as reasonably requested to verify that the necessary copying and/or deletion is completed." (Exhibit B, Confidentiality Agreement § 8.)

**37.** The Confidentiality Agreement also allows the Company to obtain injunctive relief for breaches of the agreement: "[Xu] agree[s] that (a) it may be impossible to assess the damages caused by [Xu's] violation of this Agreement or any of its terms, (b) any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and (c) Company will have the right to enforce this Agreement by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement." (Exhibit B, Confidentiality Agreement § 9.)

**38.** Xu did not comply with these contractual obligations with the Company. Upon a forensic investigation, as detailed below, the Company discovered that Xu had accessed Company systems from and downloaded confidential Company information and trade secrets to personal devices. After confronting her with the Company's findings, Xu repeatedly made misleading statements concerning the deletion, use, and disclosure of that information and those trade secrets.

**Xu's Unprofessional Behavior While Employed at the Company Leads to Her Termination**

**39.** Xu was terminated for misconduct shortly after joining Morph. Since the beginning of her employment at the Company, Xu exhibited concerning behavior in the workplace, including excessive alcohol consumption, frequent threats to resign upon receiving constructive feedback, and misrepresentation of her visa status. She also, as detailed below, downloaded sensitive,

COOLEY LLP
ATTORNEYS AT LAW

confidential Company information and trade secrets onto personal devices in contravention of her employment agreements and Company policy. For example:

> **(a)**    On several occasions during her two-month employment at the Company, Xu showed up to work under the influence of alcohol, most recently on a workday on November 29, 2024;

> **(b)**    At a work dinner on December 6, 2024, Xu revealed to other Company employees that she had downloaded confidential communication data from her previous employer, Notion Labs, Inc., which raised serious concerns about her professional ethics and trustworthiness;

> **(c)**    Most alarmingly, on or around December 18, 2024, the Company discovered that Xu had misrepresented her work visa application status to the Company, did not possess an active visa, and had been unlawfully residing in the United States for weeks. The next day, Xu suddenly departed for China, providing the Company with less than 24-hour-notice of her departure. Xu did not communicate with the Company or any of its employees for days afterward.

**40.**    Xu's behavior raised serious concerns for the Company, and, as a result, Xu's employment was terminated on December 25, 2024.

**Xu's Misleading Statements and Refusal to Comply with Her Contractual Obligations**

**41.**    In addition to Xu's unprofessional behavior, she breached her contractual obligations to the Company both during and after her employment at the Company by accessing and downloading the Company's confidential and trade secret information on her personal devices. Then, she proceeded to misrepresent her continued possession and failure to delete that information and mislead the Company on her use or disclosure of that information.

**42.**    With respect to the Company's trade secret information, Morph makes reasonable efforts to maintain the secrecy of that information. The Company does not display that information on its website or otherwise make it available to the public. The Company does not disclose that information to any third parties except when absolutely necessary, and, even then, only pursuant to

non-disclosure agreements. The Company requires its employees to sign these agreements as well.

43.    Morph's trade secret information derives independent economic value as a result of its secrecy and serves to create a competitive advantage for the Company. If a competitor were to obtain Morph's trade secrets, the Company would lose its competitive edge, and that information would become less valuable.

44.    Morph primarily stores its code, and other trade secret information, on a cloud-based storage system. The system stores files and folders on a secure cloud storage that can be accessed through an internet connection and secure applications or browser interfaces. To users, this functions equivalent to files and folders on a secured local computer (such as a on a Microsoft Windows or MacOS), where they can be accessed and edited by Company employees.

45.    Morph's trade secret information is accessible to its employees only to the extent necessary to perform the essential functions and duties of their jobs. During any employment period, Morph provides its employees with a Company-provided laptop, to make sure that personal devices are not used by its employees to access the folders and files stored on the Company's system. The Company also, per policy, only permits its employees to use Company-provided devices for work purposes or to access or download confidential Company information.

46.    Only after Xu signed her confidentiality agreement was she provided with access to the Company's trade secret and confidential information, including any information that was stored on the cloud-based system. She was granted this access throughout her employment with the Company solely to provide services to the Company in her role as Technical Staff Member, and she was expected to comply with the terms of her agreements with the Company in connection with that access.

47.    As a result of Xu's unprofessional behavior and sudden departure to China, in or around December 2024 the Company conducted a review of Xu's access of Company systems, including Github, files, and information. Through this review, the Company determined that, throughout her employment, Xu frequently used her personal devices to access the Company's systems and to download the Company's files and information from those systems to those devices.

Cooley LLP
Attorneys at Law

**48.** The review was conducted, in part, by examining Github's "log" files during Xu's employment. Those log files record actions taken by a user with respect to information and files on Github, including access and downloads. In addition, Github log files register what devices are accessing an organization's system and when devices are pulling the organization's information and files from the organization's system to the respective local devices.

**49.** The log files show that – despite being provided a Company laptop – Xu used her personal devices to log into Morph's cloud-based data systems and download Morph's information and files. Specifically, a review established that during the two months of Xu's employment, she downloaded 28 data repositories from the Company's Github system. The review also uncovered that Xu used several different personal devices, including, but not limited to, personal desktop computers, a personal cell phone, and a personal server, to access, review, and download data from Morph's Github system.

**50.** Given that the vast majority of Xu's activity occurred outside of the Company's office network and that Xu was using her personal devices to access and download from the Company's Github system, the Company has reason to believe that other Company folders and files, in addition to the 28 data repositories, were stored on those devices.

**51.** The 28 data repositories accessed and downloaded by Xu contain extremely valuable commercial information related to the Company's machine learning data for its AI model, digital infrastructure software, autonomous AI agents software, and core Morph Cloud product, as well as the Company's internal software systems, cloud architecture, systems design, user interface and user experience research, strategic roadmap, and competitive strategy. The digital infrastructure software, in particular, is critical for the functioning of its core Morph Cloud product. These are files that contain the Company's confidential information and trade secrets, and do not belong to Xu. She had no legitimate business reason to download these files to her personal devices or access them from said devices.

**52.** On December 22, 2024, alarmed by the results of the Company's review and Xu's sudden departure to China and subsequent radio silence, the Company contacted Xu via email to

inform her that the Company had terminated her access to the Company's systems and instructed her to delete all Company confidential information stored on her personal devices, including her Dell XPS laptop, Macbook, cell phone, and personal server.

53.    Instead of simply complying with the Company's requests, as Xu was obligated to under her agreements with the Company, Xu made a series of misrepresentations regarding her possession and deletion of the Company's confidential information. On that same day, Xu claimed via email to have complied with the Company's request by identifying specific code bases she had deleted.

54.    However, the Company soon discovered that Xu's representations were incomplete at best and misleading at worst. Through an analysis of the Company's file access and download records, the Company identified discrepancies between the information Xu claimed to have deleted and the information accessed and downloaded by Xu onto her personal devices.

55.    On December 24, 2024, the Company's outside counsel sent letter correspondence to Xu outlining her continuing obligations pursuant to the Confidentiality Agreement and demanding the deletion of the Company's confidential information in her possession. The letter also demanded that Xu confirm whether she had used or disclosed any of the Company's confidential information for an improper purpose and provide details concerning any such use or disclosure.

56.    In response, Xu once again represented via email that she had deleted certain confidential Company information from her personal devices. However, her representations again were not consistent with the Company's records of the files she had downloaded onto her personal devices. For example, Company log files show that Xu downloaded the "morph-labs/ssh-portal" code repository onto her personal devices, yet she failed to confirm its deletion from her personal devices or even confirm her possession of that information despite the Company's specific request concerning these files.[1] Additionally, Xu was silent as to whether she had used or disclosed the Company's confidential information for an improper purpose.

---

[1] The "morph-labs/ssh-portal" data repository contains trade secret source code that runs some of Morph's core software that allows for the functioning of its main product lines.

**57.**    After terminating Xu on December 25, 2024, the Company again reminded Xu via email that any details about the Company's software source code, internal software systems, cloud architecture, systems design, user interface and user experience research, strategic roadmap, and competitive strategy are the Company's confidential information. In particular, the source code for Company software is highly confidential and commercially valuable information that is at the core of Morph's business. It represents technical information that is the result of significant investments of time and resources by Morph, and it could not be easily acquired or duplicated by the Company's competitors without disclosure.

**58.**    During a subsequent email exchange on that day between the Company and Xu, the Company repeatedly pointed out that the list of files Xu representing as having deleted did not match the files Xu downloaded onto her personal devices, per Company records. The Company also pointed out that Xu had failed to confirm whether she had used or disclosed the Company's confidential information and provided the context for any such use or disclosure.

**59.**    Xu did not respond for 18 days, until January 12, 2025. In her response, Xu again represented via email that she had deleted certain confidential Company information from her personal devices. Further, Xu provided misleading and incomplete representations concerning her use or disclosure of the Company's confidential information. The Company asked for further clarification regarding whether she used or disclosed the Company's confidential information. Yet, since the January 12 email correspondence, Xu has not provided a further response to the Company.

**60.**    Additionally, the Company has reason to believe that Xu accepted an offer of employment by one of the Company's direct competitors. Upon information and belief, Xu has disclosed and/or used the Company's confidential information while interviewing for a new job and intends to disclose and/or use that information during her future employment.

**61.**    Due to the forgoing, Xu has failed to comply with the Confidentiality and Non-Disclosure Agreements, which she executed prior to the start of employment.

**62.**    After multiple good faith attempts to resolve this issue, Morph was left with no option for enforcing the Confidentiality and Non-Disclosure Agreements but to initiate this action

under the agreements' express terms and seek injunctive relief from this Court.

## CAUSES OF ACTION

### Count 1. Breach of Contract: Confidentiality Agreement

**63.** Morph re-alleges and incorporates by reference each and every aforementioned allegation contained in this Complaint as though fully set forth herein.

**64.** Morph and Xu are parties to the Confidentiality Agreement, which is a binding and enforceable contract. The Confidentiality Agreement is reasonable and necessary to protect Morph's confidential information and trade secrets.

**65.** At all times, Morph has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Confidentiality Agreement.

**66.** Xu has unjustifiably and inexcusably breached her obligations under Sections 1.1 and 8 of the Confidentiality Agreement by:

**(a)** Failing to return to the Company all Morph property upon termination of her employment, including files that were stored on her personal devices;

**(b)** Failing to provide a computer-usable copy of the Company's information stored on her personal devices, including her personal computers and server;

**(c)** Failing to permanently delete and expunge the Company's information from her personal devices after providing Morph with a computer-usable copy of the Company's information;

**(d)** Failing to allow the Company to access her personal devices that were used to receive, store, review, prepare or transmit any Company information, in order to confirm that: (i) a computer-usable copy of the Company's information stored on the devices is created; and (ii) the Company's information is permanently deleted and expunged from the devices;

**(e)** Upon information and belief, disclosing and/or using the Company's confidential information, including by disclosing it to competitors of the Company.

**67.** These breaches have caused, and continue to cause, harm to Morph including by

depriving it of its property, creating a risk that its confidential information and trade secrets might be disclosed or misused (which would result in a loss of value in the confidential information as the loss of secrecy depreciates the value of the information), and depriving the Company of certain protections that it contracted for when it entered into the Confidentiality Agreement with Xu and granted her access to the Company's confidential information.

68.     As a proximate result of Xu's breaches of the Confidentiality Agreement, Morph has suffered, and will continue to suffer, general and special damages in an amount to be established in an arbitration proceeding in accordance with the agreement between the Parties set forth in the Employment Agreement. Morph reserves the right to seek compensation for all damages and losses proximately caused by Xu's breaches in such an arbitration proceeding.

69.     Morph has no adequate remedy at law for the injuries currently being suffered or for the additional injuries that are threatened because it would be extremely difficult to quantify in dollars the loss sustained pending final adjudication of this matter.

70.     Morph is entitled to injunctive relief to enjoin Xu from continuing to breach her obligations and agreements pursuant to the Confidentiality Agreement, including her obligation to allow the Company to inspect her personal devices.

**Count 2. Breach of Contract: Non-Disclosure Agreement**

71.     Morph re-alleges and incorporates by reference each and every aforementioned allegation contained in this Complaint as though fully set forth herein.

72.     Morph and Xu are parties to the Non-Disclosure Agreement, which is a binding and enforceable contract. The Non-Disclosure Agreement is reasonable and necessary to protect Morph's confidential information and trade secrets.

73.     At all times, Morph has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Non-Disclosure Agreement.

74.     Xu has unjustifiably and inexcusably breached her obligations under Sections 2 and 6 of the Non-Disclosure Agreement by:

(a)    Failing to return to the Company all Morph property upon termination of her employment, including files that were stored on her personal devices;

(b)    Failing to permanently delete and expunge the Company's information from her personal devices;

(c)    Upon information and belief, disclosing and/or using the Company's confidential information, including by disclosing it to competitors of the Company.

75.    These breaches have caused, and continue to cause, harm to Morph including by depriving it of its property, creating a risk that its confidential information and trade secrets might be disclosed or misused (which would result in a loss of value in the confidential information as the loss of secrecy depreciates the value of the information), and depriving the Company of certain protections that it contracted for when it entered into the Non-Disclosure Agreement with Xu and granted her access to the Company's confidential information.

76.    As a proximate result of Xu's breaches of the Non-Disclosure Agreement, Morph has suffered, and will continue to suffer, general and special damages in an amount to be established in an arbitration proceeding in accordance with the agreement between the Parties set forth in the Employment Agreement. Morph reserves the right to seek compensation for all damages and losses proximately caused by Xu's breaches in such an arbitration proceeding.

77.    Morph has no adequate remedy at law for the injuries currently being suffered or for the additional injuries that are threatened because it would be extremely difficult to quantify in dollars the loss sustained pending final adjudication of this matter.

78.    Morph is entitled to injunctive relief to enjoin Xu from continuing to breach her obligations and agreements pursuant to the Non-Disclosure Agreement.

**Count 3. Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act**

79.    Morph re-alleges and incorporates by reference each and every aforementioned allegation contained in this Complaint as though fully set forth herein.

80.    Xu had access to Morph's trade secrets while working for the Company, such as source code of Company software and products and the Company's internal software systems,

cloud architecture, systems design, user interface and user experience research, strategic roadmap, and competitive strategy information. Morph spent considerable time, energy and resources developing these trade secrets.

81. Morph's trade secrets are secret and nonpublic, and Morph has taken reasonable measures to keep this information secret and confidential and out of the hands of its competitors, including by limiting access to its trade secret information, entering into confidentiality agreements with the Company's employees, training employees on their confidentiality and security obligations, requiring all employees use work devices to access Company systems and information, and encrypting employees' work laptops and devices.

82. Morph's trade secrets derive independent economic value as a result of their secrecy, which serves to create a competitive advantage for the Company.

83. Xu had and has duties not to misappropriate the Company's trade secrets or to disclose such information outside of the Company. The Confidentiality and Non-Disclosure Agreements are enforceable agreements that imposed those contractual obligations, including reasonable and necessary obligations of nondisclosure with respect to its trade secrets, on Xu.

84. Xu took and maintained possession of Morph's trade secrets after her employment with the Company ended. Xu, on information and belief, used such information and/or disclosed it to direct competitors of Morph, including while interviewing for new employment. Further, the Company has reason to believe that Xu intends to disclose and/or use the Company's confidential information during future employment at a competitor.

85. Such disclosure or use of the Company's trade secrets by Xu degrades the value of those trade secrets as Xu and/or her future employer could not otherwise acquire or duplicate the trade secrets by legitimate or proper means, and would gain an unfair market advantage through use of the misappropriated trade secrets.

86. Xu's misappropriation of Morph's trade secrets has caused and will cause the Company to suffer substantial injury, including actual damages, lost profits, harm to its reputation, and diminution in the value of its trade secrets. Xu has also been unjustly enriched by its

misappropriation of Morph's trade secrets.

87.    Xu's actual or threatened misappropriation of Morph's trade secrets is intentional, knowing, willful, fraudulent, malicious, and oppressive. Xu acquired Morph's trade secrets with the deliberate intent to injury the Company and to enrich herself.

88.    Morph has no adequate remedy at law for the injuries currently being suffered or for the additional injuries that are threatened because it would be extremely difficult to quantify in dollars the loss sustained pending final adjudication of this matter.

89.    Morph, therefore, is entitled to an injunction barring Xu from misappropriating and continuing to misappropriate Morph's trade secrets and allowing Morph to forensically review Xu's personal devices for Morph's trade secrets.

90.    Antares reserves the right to seek money damages according to proof, exemplary damages, and attorneys' fees in an arbitration proceeding in accordance with the agreement between the Parties set forth in the Employment Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Morph prays that the Court enter an award in favor of Morph and against Xu as follows:

1.    For a ruling in favor of Morph on all Causes of Action;

2.    Pursuant to the Causes of Action, enter an injunction under which, Xu is enjoined from reviewing, disclosing, or transmitting Morph's information for any purposes (including but not limited to providing the information to any future employers), including all information recorded in the files that Xu accessed in and downloaded from Morph's systems;

3.    Pursuant to the Causes of Action, issue an order requiring Xu to comply with her obligations under the Confidentiality Agreement and Non-Disclosure Agreement, including by requiring:

(a)    Xu to preserve all relevant and discoverable evidence by causing a forensic image of all computer systems, storage, and electronic devices that were potentially used to receive, store, review, prepare or transmit any Company information to be created and held by Xu or Xu's

counsel;

        **(b)**     Xu to work with a neutral third-party expert, retained at Xu's expense, to catalogue Morph's documents and materials in Xu's possession, custody, or control and provide a list of such materials to counsel for the parties;

        **(c)**     Xu to conduct a diligent search of her personal affects in order to locate any hard copies of materials containing Morph information;

        **(d)**     Xu to return to Morph all originals, copies, or other reproductions, in any form whatsoever, of any document of Morph, and (after preserving a computer-useable copy of all such information pursuant to Section 8 of the Confidentiality Agreement) to permanently purge or destroy any computerized or other records belonging to Morph that Xu has within her possession, custody, or control; and

        **(e)**     Xu to require the neutral third-party expert to confirm Xu's efforts to comply with the Confidentiality and Non-Disclosure Agreements and certify to Morph that Xu has fully complied with those agreements; and

        **(f)**     Xu to refrain from working or providing services to any competitive companies or businesses until Xu has come into full compliance with her obligations under the Confidentiality and Non-Disclosure Agreements;

    **4.**     For such other and further relief as the Court may deem proper.

Dated: January 24, 2025

                      **COOLEY LLP**
                      MATTHEW D. CAPLAN (260388)
                      ALEXANDER K. BREHNAN (317776)

                      By:    */s/ Matthew D. Caplan*
                           Matthew D. Caplan

                      Attorneys for Plaintiff
                      ANTARES SYSTEMS INC.